## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Small Business Financial Solutions, LLC** | : |
| 4500 East West Hwy, 6th Floor | : |
| Bethesda, MD 20814 | : **Complaint for a Civil Case** |
| | : |
| Plaintiff, | : Civil Action No:  8:21-cv-00811-TDC |
| v. | : |
| | : **Non-Jury** |
| | : |
| **Corporate Client Services, LLC** | : |
| 1880 North Congress Ave, Suite 211 | : |
| Boynton Beach, FL 33426 | : |
| Defendant(s). | : |
| _____ | : |

## COMPLAINT

Plaintiff, Small Business Financial Solutions, LLC, by its undersigned attorneys, alleges as follows:

Plaintiff brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Act"), 15 U.S.C. §§ 6101 et seq., as amended, to obtain monetary relief, permanent injunctive relief, and other relief this Honorable Court may deem appropriate for Defendant's abusive acts and practices in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended.[1]

Plaintiff also seeks monetary and injunctive relief for Defendant's tortious interference with Plaintiff's contracts.

## PARTIES

1.  Plaintiff, Small Business Financial Solutions, LLC, is a Delaware limited liability company with its principal place of business in Bethesda, MD.

---

[1] The TSR implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108. 16 C.F.R. §310.1.

2.   Defendant, Corporate Client Services, LLC, is a Florida limited liability company.

## JURISDICTION

3.   Pursuant to 28 U.S.C. § 1331, this action arises under 15 U.S.C. §§ 6101-6108, as implemented by 16 C.F.R. Part 310. Jurisdiction in this Honorable Court is proper under 15 U.S.C. § 6104(a), as it has been less than three (3) years since Plaintiff discovered Defendant's violation(s), and the amount of actual damages exceeds $50,000.00. Additionally, a "civil action brought under subsection (a) in a district court of the United States may be brought in the district in which the defendant […] transacts business or wherever venue is proper under section 1391 of title 28." 15 U.S.C. § 6104(f). Under 28 U.S.C. § 1391, "a civil action may be brought in […] a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action is situated […]". 28 U.S.C. § 1391(b)(2).

4.   Defendant is subject to personal jurisdiction in Maryland pursuant to Md. Cts & Jud. Proc. Code Ann. § 6-103(b)(4) because it regularly interferes with the business transactions of a Maryland business, and as a result of actions taken by it outside of Maryland, has caused injury to Plaintiff in Maryland.

5.   Venue is proper in this court pursuant to Md. Cts & Jud. Proc. Code Ann. § 6-202(3).

## INTRODUCTION

6.   Plaintiff, Small Business Financial Solutions, LLC ("SBFS"), provides business funding to small businesses, including limited liability companies, corporations, and sole proprietorships.

7.   Defendant, Corporate Client Services, LLC ("CCS"), is a seller of debt relief services in connection with telemarketing conduct, and offers to provide debt relief services in exchange

for consideration, as defined by the TSR.

8.  Defendant employs a standard business practice of specifically targeting Plaintiff's customers through various methods, including but not limited to, searching for Plaintiff's UCC-1 filings and then contacting Plaintiff's customers to sell debt relief services, in order to interfere with payments to Plaintiff pursuant to Plaintiff's contracts with its customers.

9.  Defendant intentionally induces Plaintiff's customers to breach the terms of their agreements with Plaintiff.

10. During sales calls made to Plaintiff's customers, Defendant provides incorrect legal advice, as well as makes false statements about substantive terms in Plaintiff's agreements.

11.  Additionally, during such sales calls, Defendant falsely implies that it has a favorable working relationship with Plaintiff, misleading Plaintiff's customers to believe that a settlement at a fifty percent (50%) reduction is a likely outcome of entering the debt relief program with Defendant.

12.  Defendant promises to save the customer money on their existing contracts with the Plaintiff by renegotiating payments, and/or settling the debt owed to Plaintiff for less than the customer owes.

13.  Additionally, Defendant asserts that the customer can simply claim "hardship" as a defense to avoid their payment obligations, and that the Defendant will be able to significantly reduce the customer's payment obligation or avoid paying altogether.

14.  The promises Defendant makes to Plaintiff's customers are misleading. These false and misleading representations made by Defendant induce Plaintiff's customers to breach their contracts with Plaintiff and to enter into a Debt Relief Agreement (defined below) with Defendant.

15.  Defendant requires Plaintiff's customers to enter into a Business Debt Resolution and Settlement Agreement ("Debt Relief Agreement(s)") for the debt relief services.

16.  As part of the Debt Relief Agreement, the customer must deposit payments into a "Settlement Account", which is used by the Defendant to collect its debt relief fees and administer its services. *See* Debt Relief Agreements, ¶ 2.A, pg.2, attached hereto as Exhibits 1 & 2.

17.  As a result of entering into the Debt Relief Agreement, either on their own volition, or pursuant to guidance from Defendant, customers either stop making payments to Plaintiff, instruct their bank to issue stop-payments, and/or cut off Plaintiff's contractually authorized access to those accounts, all of which are violations of their funding agreement with the Plaintiff.

18.  When the customer realizes that Defendant is not fulfilling its promises, they will sometimes withdraw from the debt relief program, as the Debt Relief Agreement allows them to do, with the belief that all of the funds in the Settlement Account, minus nominal administrative fees, will be returned. However, the Defendant does not return the funds as the customer believes it will do. Since the Defendant deems the Defendant's service fees earned when deposited into their Settlement Account, and not at the time the fees are earned by rendering the actual service, the Defendant deducts its unearned fee from the Settlement Account and only if there is a remaining amount, will that amount be returned to the customer. At this point, the customer no longer has the funds needed to settle its debt or cure any default with the Plaintiff. *See* Debt Relief Agreements, ¶ 4.A, pg.3, Exhibits 1 & 2.

19.  Due to Defendant's interference with Plaintiff's contracts, Plaintiff is unable to resolve its customers' defaults, and is typically left with no other option than to pursue litigation.

20.  If the customer is sued by Plaintiff for default/breach during the period the customer is enrolled in the debt relief program with Defendant, and the customer is still making payments into its Settlement Account, the Defendant will then offer legal services through an affiliate program, provided the customer makes additional payments for such legal-specific fees. *See* Debt Relief Agreements, ¶ 2.B, pg.2, Exhibits 1 & 2.

21.  Once the Plaintiff files a lawsuit in Maryland, Plaintiff continues to attempt to resolve and/or settle its customer's default, but is often unable to get in contact with its customer and/or is directed to communicate only with the Defendant. The Defendant then hires a local Maryland attorney to represent the customer in the active lawsuit filed against the customer.

22.  The customer's attorney communicates with the Defendant, not the customer whom they are hired to represent (who is the attorney's client). The customers are rarely, if ever, put in contact with the attorney representing them, and have no control over the litigation or outcome of their case.

23.  The attorney(s) hired by the Defendant to represent the respective customers, consistently and as a standard legal practice, refuse to engage in litigation, refuse to respond to discovery, fail to file timely pleadings, and fail to communicate settlement offers to the customers. The attorney's (and Defendant's) failure to uphold their legal and contractual obligations to represent the customer have routinely resulted in court orders to compel discovery and sanctions ordered against their client (the customer) in the form of judgment being entered against the customer.[2] These legal tactics are a failure to carry out the minimum fiduciary duty the attorney

---

[2] A court order to compel discovery that resulted in sanctions in the form of a Judgment against the customer occurred in the following cases brought in the Circuit Court for Montgomery County, Maryland: *Small Business Financial Solutions, LLC v. Truemetrics, et al*., Case No. 469837V; *Small Business Financial Solutions, LLC v. Lucas David Design, et al*., Case No. 470412V; *Small Business Financial Solutions, LLC v. MCE Investments, LLC, et al*., Case No. 473396V; *Small Business Financial Solutions, LLC v. His Handiworks, LLC, et al*., 473739V; and *Small Business Financial Solutions, LLC v. New Method, LLC, et al.,* 477518V. *See also* Exhibit 9, herein.

owes to its client, a violation of attorney ethics, and could constitute legal malpractice.

24.    Defendant has induced many of Plaintiff's customers to breach their respective agreements with Plaintiff, resulting in substantial injury to Plaintiff. *See supra* note 2 herein.

25.    At the time of Defendant's solicitations, the customers are, in most cases, still performing on their contractual obligations with Plaintiff.

26.    Defendant's business practices described herein, tortiously interfere with Plaintiff's contracts.

27. Additionally, Plaintiff's customers are falling prey to Defendant's calculated targeting of the Plaintiff. Defendant searches for Plaintiff's UCC filings, and then abusively induces the customer in Plaintiff's agreements to enter into a Debt Relief Agreement with Defendant. Defendant intentionally targets the Plaintiff, and in injuring the Plaintiff, Plaintiff's customers are also injured as a result.

28.    Defendant's tortious interference constitutes a violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, by violating the TSR, 16 C.F.R. Part 310.

29.    Based on the plain language in Defendant's Debt Relief Agreements, it is clear the Defendant is aware of the obligations required under the TSR. *See generally*, Exhibits 1 & 2.

30.    As stated in its Debt Relief Agreements, Defendant deems its service fees earned at the time the funds are deposited into the customer's Settlement Account, not when the Defendant settles, negotiates, or resolves the debt, and after one payment has been made pursuant to such settlement, as required under the TSR. *See* Debt Relief Agreements, ¶ 4.A, pg.3, Exhibits 1 & 2.

31.    Additionally, when the customer decides to withdraw from the program prior to any services rendered, the Defendant deducts its service fees (despite not being earned yet) from the

customer's Settlement Account. *See Id.*, at ¶ 4.D, pg.4. Such action violates the requirement

under section 310.4 of the TSR. *See* 16 C.F.R. §310.4(a)(5)(i).

32.    As a result of Defendant's tortious interference with Plaintiff's contracts, Plaintiff is not

able to assist its customers with payments or enroll its customers in the many programs offered

by Plaintiff that are intended to help its customers get back on track with their payment

obligations.

33.    Additionally, as a result of Defendant's tortious interference with Plaintiff's contracts,

Plaintiff is unable to receive its contracted-for payments from its customers, thereby continually

and consistently being injured by Defendant's actions.

34.    Plaintiff seeks damages for the actions Defendant has already committed, and injunctive

relief to prevent Defendant from continuing their conduct in the future, in order to redress past

harms and prevent future harms.

## **FACTUAL BACKGROUND**

### **A.  The Logan Gardens, Inc. Loan**

35.    On or near December 10, 2019, Plaintiff provided a small business loan to Logan

Gardens, Inc. ("Logan Gardens"), whereby William Logan ("Mr. Logan") entered into the

Business Loan and Security Agreement (the "Logan Agreement") with Plaintiff on behalf of

Logan Gardens as the Owner. *See* Business Loan and Security Agreement, attached hereto as

Exhibit 3.

36.    Mr. Logan also entered into the Logan Agreement individually, as a personal guarantor,

which made him jointly and severally liable for all underlying obligations owed pursuant to the

Logan Agreement. *See Id.* at ¶ 43.

37.    Under the terms of the Logan Agreement, Logan Gardens was obligated to pay the

"Total Payback Amount" of $210,250.00 in seventy-seven (77) weekly payments of $2,730.52, due Thursday of each week. *See* Exhibit 3.

38.    On or near June 23, 2020, Defendant solicited Logan Gardens' business for the purposes of selling debt relief services. *See* Affidavit of William Logan, Exhibit 4.

39.    Defendant contacted Logan Gardens directly in order to induce Logan Gardens to enter into a Debt Relief Agreement with Defendant, promising to help Logan Gardens save money. *See Id.*

40.    Defendant made false accusations that Plaintiff's loan to Logan Gardens was usurious, and promised to reduce Logan Gardens' payments owed to Plaintiff if Logan Gardens entered into a Debt Relief Agreement with Defendant. *See Id.*

41.    On June 23, 2020, as a result of Defendant's solicitation of Logan Gardens, Logan Gardens was induced into entering a Business Debt Resolution and Settlement Agreement ("Logan Debt Relief Agreement") with Defendant. *See* Exhibits 1 & 4.

42.    Prior to being contacted by Defendant, Logan Gardens had not missed any contractual payments owed to Plaintiff. *See* Exhibits 4 & 5.

43.    On or near June 26, 2020, Defendant advised Logan Gardens to stop paying Plaintiff its contractual payments. *See* Exhibits 4 & 5.

44.    Due to entering into the Logan Debt Relief Agreement with Defendant, Logan Gardens was unable and/or unwilling to continue to pay Plaintiff its full contractual payments. *See* Exhibits 1 & 5.

45.    Before, during, and after inducing Logan Gardens to breach its funding agreement with Plaintiff, and advising Logan Gardens to stop paying Plaintiff, Defendant used abusive practices to collect payments from Logan Gardens and keep those funds without providing any debt relief

services to Logan Gardens, as required under section 310.4 of the TSR.

46.    On or near August 17, 2020, upon realizing Defendant was being untruthful and misleading about its services and Defendant's relationship with Plaintiff, Logan Gardens withdrew from Defendant's debt relief program. *See* Exhibit 4.

47.    After Logan Gardens left Defendant's debt relief program on or near August 17, 2020, Plaintiff and Logan Gardens were able to communicate again and work out a payment plan to resume payments. Plaintiff's receipt of the payments from Logan Gardens after August 17, 2020 are not a result of the Defendant negotiating, settling, or altering any terms pursuant to any settlement agreement, debt management plan, or any other contractual agreement on behalf of Logan Gardens. *See* Exhibits 4 & 5.

48.    As illustrated in pertinent part below, Defendant's actions of tortious interference with Plaintiff's contract also constitute a violation the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, by violating the TSR, 16 C.F.R. Part 310.

49.    Defendant, through contractual obligations pursuant to its Debt Relief Agreements, requires Plaintiff's customers to pay Defendant's fees for services prior to the services being rendered, and prior to at least one payment being made pursuant to any debt resolution agreement memorializing such services rendered. Such contractual requirement is a violation of 16 C.F.R. § 310.4(a)(5)(i). *See* Exhibit 1.

50.  The terms of the Logan Debt Relief Agreement state, in pertinent part, the following:

> **Program Deposits.** Beginning on 7/3/2020, you will deposit $1,601.86 per week from your primary bank account into a dedicated FDIC-insured account ("Settlement Account") established with EPPS. The Settlement Account shall be for the exclusive purpose of collecting funds for settlement payments and our fees. You will, at all times, own and control the Settlement Account, the account terms and conditions of which will be set forth in a separate agreement between you and EPPS. As more fully set forth in Paragraph 4 below, the total of these payments

reflects the sum of (i) Corporate Client Services LLC's fees and (ii) the amount estimated to be sufficient to settle the debts listed in the Schedule of Enrolled Debts.

*See* Exhibit 1 at ¶ 2.A. Additionally, paragraph 4 of the Logan Debt Relief Agreement, states the following:

**A.        Settlement Fee**: Company charges a settlement fee of 25% of the amount on the Effective Date of each debt as reflected in the Schedule of Enrolled Debts, and a weekly/monthly administrative account maintenance fee of $25. This administrative maintenance fee is not included in the 25% settlement fee, and will not be used toward payments to creditors. […]The settlement fees payable to Corporate Client Services LLC are collected and paid over the first two thirds of your Program Duration, with the remainder of all payments, minus nominal banking and administrative fees, accumulating in your dedicated Settlement Account for the purpose of paying settled debts. You understand and agree that the fees due to Corporate Client Services LLC are due and payable on each debt enrolled in the Schedule of Enrolled Debt even if a creditor offers to settle any such debt directly with you.

[...]

**D.        Non-Refundable Fees:** If Client chooses to cancel their participation in the Program, all Program Fees remitted by Client prior to and including their date of cancellation are deemed earned and non-refundable, and all banking fees, and administrative fees attendant to processing banking fees, are likewise deemed non- refundable.

51.        Since there was no settlement or renegotiation of any debt, there existed no settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or Defendant. Therefore, there was never a payment made pursuant to such an agreement, and Defendant's contract provisions allowing Defendant to deduct any fee for services (not rendered) is in direct violation of section 310.4 of the TSR. *See* Exhibit 1 at ¶ 4.A and 4.D.

52.        Defendant was aware that injury to Plaintiff and Plaintiff's customers was a likely outcome as a result of its tortious interference, and is illustrated in paragraph 2.C(iv) of

Defendant's Logan Debt Relief Agreement:

> **(iv) Effects of Participation in a Debt Resolution Program**:
> Failing to make your minimum monthly payments to your
> Creditors may be breaking the terms of agreements with your
> Creditors, and (a) will likely adversely affect your
> creditworthiness, credit report, and credit score, and (b) may
> lead creditors to increase finance charges, add late fees, and
> pursue litigation or other legal collection actions.[…]

53.    Defendant's intentional tortious interference with Plaintiff's Logan Agreement was intended to negatively impact and injure the Plaintiff. Defendant instructed and/or induced Logan Gardens to breach the Logan Agreement with Plaintiff so Defendant could then collect its service fees.

### B. The Current Electric of Southern Oklahoma, LLC Loan

54.    On or near March 2, 2020, Plaintiff provided a small business loan to Current Electric of Southern Oklahoma, LLC ("Current Electric"), whereby Thomas Andrews ("Mr. Andrews") entered into the Business Loan and Security Agreement (the "Current Electric Agreement") with Plaintiff on behalf of Current Electric as the Owner. *See* Business Loan and Security Agreement, attached hereto as Exhibit 6.

55.    Mr. Andrews also entered into the Current Electric Agreement individually, as a personal guarantor, which made him jointly and severally liable for all underlying obligations pursuant to the Current Electric Agreement. *See Id.* at ¶ 43.

56.    Under the terms of the Current Electric Agreement, Current Electric was obligated to pay the "Total Payback Amount" of $65,500.00 in one hundred eighty (180) daily payments of $363.89. *See* Exhibit 6.

57.    On or near May 5, 2020, Defendant solicited Current Electric's business for the purposes of selling debt relief services. *See* Affidavit of Thomas Andrews, Exhibit 7.

58.    Defendant contacted Current Electric directly in order to induce Current Electric to enter into a Debt Relief Agreement with Defendant, promising to help Current Electric save money. *See* Exhibit 7.

59.    Defendant made false accusations that Plaintiff's loan to Current Electric was usurious, and promised to reduce Current Electric's payments owed to Plaintiff if Current Electric entered into a Debt Relief Agreement with Defendant. *See* Exhibit 7.

60.    On or near May 5, 2020, as a result of Defendant's solicitation of Current Electric, Current Electric was induced into entering a Business Debt Resolution and Settlement Agreement ("Current Electric Debt Relief Agreement") with Defendant. *See* Exhibits 2 & 7.

61.    Prior to being contacted by Defendant, Current Electric had not missed any contractual payments owed to Plaintiff. *See* Exhibits 6-8.

62.    On or near June 1, 2020, Defendant advised Current Electric to issue a stop-payment instruction to its bank to prevent Plaintiff from receiving any further contractual payments. *See* Exhibits 7 & 8.

63.    Due to entering into the Current Electric Debt Relief Agreements with Defendant, Current Electric was unable and/or unwilling to continue to pay Plaintiff its full contractual payments. *See* Exhibits 7 & 8.

64.    Before, during, and after inducing Current Electric to breach its funding agreement with Plaintiff, and advising Current Electric to stop paying Plaintiff, Defendant used abusive practices to collect payments from Current Electric and keep those funds without providing any debt relief services to Current Electric, as required under §310.4 of the TSR.

65.    On or near October 28, 2020, upon realizing Defendant was being untruthful and misleading about its services and Defendant's relationship with Plaintiff, Current Electric

withdrew from Defendant's debt relief program. *See* Exhibit 7.

66.     After Current Electric left Defendant's debt relief program on or near October 28, 2020, Plaintiff and Current Electric were able to communicate again and work out a payment plan to resume payments. Plaintiff's receipt of the payments from Current Electric after October 28, 2020 are not a result of the Defendant negotiating, settling, or altering any terms pursuant to any settlement agreement, debt management plan, or any other contractual agreement on behalf of Current Electric. *See* Exhibit 7.

67.     As illustrated in pertinent part below, Defendant's tortious interference with Plaintiff's contract also constitutes a violation the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, by violating the TSR, 16 C.F.R. Part 310.

68.     Defendant, through contractual obligations pursuant to its Debt Relief Agreements, requires Plaintiff's customers to pay Defendant's fees for services prior to the services being rendered and prior to at least one payment being made pursuant to any such debt resolution agreement memorializing such services rendered. Such contractual requirement is a violation of 16 C.F.R. § 310.4(a)(5)(i). *See* Exhibit 2.

69.   The terms of the Current Electric Debt Relief Agreement state, in pertinent part, the

    following:

> **Program Deposits**. Beginning on 5/22/2020, you will deposit $902.62 per week from your primary bank account into a dedicated FDIC-insured account ("Settlement Account") established with EPPS. The Settlement Account shall be for the exclusive purpose of collecting funds for settlement payments and our fees. You will, at all times, own and control the Settlement Account, the account terms and conditions of which will be set forth in a separate agreement between you and EPPS. As more fully set forth in Paragraph 4 below, the total of these payments reflects the sum of (i) Corporate Client Services LLC's fees and (ii) the amount estimated to be sufficient to settle the debts listed in the Schedule of Enrolled Debts.

*See* Exhibit 2 at ¶ 2.A. Additionally, paragraph 4 of the Current Electric Debt Relief

Agreements, states the following:

> **A.    Settlement Fee**: Company charges a settlement fee of 25% of the amount on the Effective Date of each debt as reflected in the Schedule of Enrolled Debts, and a weekly/monthly administrative account maintenance fee of $25. This administrative maintenance fee is not included in the 25% settlement fee, and will not be used toward payments to creditors. […] The settlement fees payable to Corporate Client Services LLC are collected and paid over the first two thirds of your Program Duration, with the remainder of all payments, minus nominal banking and administrative fees, accumulating in your dedicated Settlement Account for the purpose of paying settled debts. You understand and agree that the fees due to Corporate Client Services LLC are due and payable on each debt enrolled in the Schedule of Enrolled Debt even if a creditor offers to settle any such debt directly with you.

> [...]

> **D.    Non-Refundable Fees:** If Client chooses to cancel their participation in the Program, all Program Fees remitted by Client prior to and including their date of cancellation are deemed earned and non-refundable, and all banking fees, and administrative fees attendant to processing banking fees, are likewise deemed non- refundable.

70.    The Defendant deducted its fee from Current Electric's Settlement

Account prior to rendering any services. *See* Exhibit 7.

71.    Since there was no settlement or renegotiation of any debt, there existed no

settlement agreement, debt management plan, or other valid contractual agreement

between the customer and the creditor or Defendant. Therefore, there was never a

payment made pursuant to such an agreement, and Defendant's deduction of any fee

for services (not rendered) was in direct violation of section 310.4 of the TSR. *See*

Exhibit 2 at ¶ 4.A and 4.D; Exhibit 7.

72.    Defendant is aware that injury to Plaintiff and Plaintiff's customers is a likely

outcome as a result of its tortious interference, and is illustrated in paragraph 2.C(iv) of the

Current Electric Debt Relief Agreement:

> **(iv) Effects of Participation in a Debt Resolution Program**:
> Failing to make your minimum monthly payments to your
> Creditors may be breaking the terms of agreements with your
> Creditors, and (a) will likely adversely affect your
> creditworthiness, credit report, and credit score, and (b) may
> lead creditors to increase finance charges, add late fees, and
> pursue litigation or other legal collection actions.[…]

73.    Defendant's intentional tortious interference with Plaintiff's Current Electric

Agreement was intended to negatively impact and injure the Plaintiff. Defendant instructed

and/or induced Current Electric to breach the Current Electric Agreement so Defendant

could then collect its service fees. *See* Exhibit 7.

## C. Defendant's Interference with Maryland Contracts as a Standard Business Practice

74.    Defendant regularly interferes with contracts by and between Plaintiff and

Plaintiff's customers; a Maryland business and its customers. *See supra* note 2 herein;

*see also* Affidavit of Patrick Siegfried, Exhibit 9.

75.    Defendant regularly interferes and induces breaches of contracts by and between

Plaintiff and Plaintiff's customers; a Maryland business and its customers. *See supra* note

2 herein; *see also* Exhibit 9.

76.    Defendant is aware that Plaintiff is located in Maryland and that payments due to

Plaintiff are sent to Maryland and/or ACH transactions are initiated from and performed in

Maryland, and Defendant intentionally interferes with these payments. *See supra* note 2

herein; *see also* Exhibit 9.

77. Prior to inducing Plaintiff's customers to breach the terms of their respective agreements,

Defendant is aware that Plaintiff is located in Maryland and is aware that any losses incurred

by Plaintiff as a result of the breach of the customers' agreements, and Defendant's interference

of such agreements, is borne by Plaintiff in Maryland (a Maryland business). *See* Exhibit 9.

78. Defendant's business practices described herein are intentional and constitute tortious interfere with Plaintiff's contracts, and these actions also constitute a violation of the TSR.

## CLAIMS

## COUNT I

### (Violation of Telemarketing Sales Rule, 16 C.F.R. Part 310)

79.    Plaintiff repeats and realleges paragraphs 1 through 78 of the Complaint, as if fully set forth herein.

80.    Defendant's actions constitute a violation of the Telemarketing Sales Rule, 16 C.F.R. Part 310.

81.    The Defendant is a "seller" within the meaning of the TSR. 16 C.F.R. § 310.2(dd).

82.    The Defendant is a seller of "debt relief services" within the meaning of the TSR. 16 C.F.R. § 310.2(o).

83.    Logan Gardens, Current Electric, and the numerous other customers of the Plaintiff are "persons" within the meaning of the TSR as they include "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity". 16 C.F.R. § 310.2(y).

84.    Logan Gardens, Current Electric, and the numerous other customers of the Plaintiff are also "customers" within the meaning of the TSR, as they include "any person who is or may be required to pay for goods or services offered through telemarketing". 16 C.F.R. § 310.2(n).

85.    Defendant routinely engages in "telemarketing" conduct to sell its debt relief services, within the meaning of the TSR. "Telemarketing means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one

or more telephones and which involves more than one interstate telephone call." 16 C.F.R. §

310.2(gg).

86.   Due to the Defendant being a seller of debt relief services the Defendant is subject to the

TSR, and must comply with its requirements.

87.   Defendant requires its customers who purchase its debt relief services, to pay

Defendant's fees for services prior to rendering any services being rendered and prior to the

customer making at least one payment pursuant to an agreement memorializing such rendered

services. This is a violation of 16 C.F.R. § 310.4(a)(5)(i). *See* Exhibits 1 & 2.

88.   Each of these acts has been performed in interstate commerce.

89.   These acts are specifically and continuously targeted at Plaintiff and Plaintiff's

customers, and are likely to continue.

90.   Plaintiff has been damaged in its business and property as a result of Defendant's acts

violating the TSR. Plaintiff has lost tens of thousands of dollars owed to Plaintiff by Logan

Gardens, Current Electric and Plaintiff's many other customers as a result of Defendant's

violations.  *See supra* note 2 herein; *see also* Exhibit 9.

## COUNT II

### (Tortious Interference with Contract)

91.   Plaintiff repeats and realleges paragraphs 1 through 78 of the Complaint, as if fully set

forth herein.

92.   Plaintiff, Logan Gardens, and Mr. Logan entered into the Logan Agreement on

December 10, 2019.  *See* Exhibit 3.

93.   Defendant is aware of the Logan Agreement between Plaintiff, Logan Gardens, and Mr.

Logan, and intentionally sought out to interfere with Plaintiff's agreement by specifically

searching Plaintiff's UCC-1 filings. *See* Exhibits 1 & 4.

94.   Defendant solicited Logan Gardens when it contacted Logan Gardens and Mr. Logan for the purpose of selling debt relief services and inducing Logan Gardens to breach the Logan Agreement with Plaintiff in favor of making payments to Defendant instead. *See* Exhibit 4.

95.   Defendant then used Logan Gardens' deposit payments to pay Defendant's service fees (for services not rendered), and planned on using any remaining amount, if any, to pay to Plaintiff. *See* Exhibit 1 & 4.

96.   Logan Gardens and Mr. Logan breached the Logan Agreement with Plaintiff as a result of Defendant intentionally interfering with the Logan Agreement. *See* Exhibit 4.

97.    Plaintiff has suffered damages as a result of Defendant's tortious interference with the Logan Agreement, including the current balance due and owing from Logan Gardens and Mr. Logan in the amount of $55,433.75, and the costs incurred by Plaintiff to initiate collection actions. *See* Exhibit 5.

98.   Plaintiff, Current Electric, and Mr. Andrews entered into the Current Electric Agreement on March 2, 2020.  *See* Exhibit 6.

99.    Defendant is aware of the Current Electric Agreement between Plaintiff, Current Electric, and Mr. Andrews, and intentionally sought out to interfere with Plaintiff's agreement by specifically searching Plaintiff's UCC-1 filings. *See* Exhibits 2 & 7.

100.   Defendant solicited Current Electric when it contacted Current Electric for the purpose of selling debt relief services and inducing Current Electric to breach the Current Electric Agreement with Plaintiff in favor of making payments to Defendant instead. *See* Exhibit 7.

101.   Defendant then used Current Electric's deposit payments to pay Defendant's service fees (for services not rendered), and only then planned on using the remaining amount, if any, to

pay to Plaintiff. *See* Exhibits 2 & 7.

102.   Current Electric and Mr. Thomas breached the Current Electric Agreement with Plaintiff as a result of Defendant intentionally interfering with the Current Electric Agreement. *See* Exhibit 7.

103.   Plaintiff has suffered damages as a result of Defendant's tortious interference with the Current Electric Agreement, including the current balance due and owing from Current Electric and Mr. Thomas in the amount of $29,908.82, and the costs incurred by Plaintiff to initiate collection actions. *See* Exhibit 8.

104.   Plaintiff has entered into many funding agreements with numerous customers.  *See supra* note 2 herein; *see also* Exhibit 9.

105.   Defendant is aware of Plaintiff's funding agreements, intentionally seeks to interfere with Plaintiff's agreements, and locates Plaintiff's customers by specifically searching Plaintiff's UCC-1 filings.

106.   Upon information and belief, Defendant solicits many of Plaintiff's customers for the purpose of selling debt relief services and induces them to breach their respective agreements with Plaintiff, in favor of making payments to Defendant instead. *See supra* note 2 herein; *see also* Exhibit 9.

107.   Defendant then uses the customer's deposit payments into their Settlement Accounts to pay Defendant's service fees (for services not rendered), and represents that it plans on using the remaining amount, if any, to pay to Plaintiff. *See* Exhibits 1 & 2.

108.   Upon information and belief, many of Plaintiff's customers have breached their respective agreements as a result of Defendant's intentional interference with Plaintiff's agreements. *See* Exhibit 9.

109.  Plaintiff has suffered in excess of $75,000 in damages as a result of Defendant's tortious interference with Plaintiff's agreements and the subsequent breaches caused by Defendant's actions described herein. *See* Exhibit 9.

**<u>RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully requests preliminary and permanent injunctive relief, judgment in its favor and against Defendant, Corporate Client Services, LLC, and requests compensatory damages, special damages, interest, attorneys' fees and costs, and such additional and further relief this Honorable Court deems just and proper.

Date: 3/30/2021                                 Respectfully submitted,

                          By:     /s/ Vanessa M. Petty
                                  Vanessa M. Petty, Bar ID: 21541
                                  4500 East West Highway, 6th Floor
                                  Bethesda, Maryland 20814
                                  Ph: 240-514-2003
                                  vanessapetty@rapidfinance.com
                                  *Counsel for Plaintiff*

## CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Date: 3/30/2021                                        Respectfully submitted,

                                    By:      /s/ Vanessa M. Petty
                                             Vanessa M. Petty, Bar ID: 21541
                                             4500 East West Highway, 6th Floor
                                             Bethesda, Maryland 20814
                                             Ph: 240-514-2003
                                             vanessapetty@rapidfinance.com
                                             *Counsel for Plaintiff*